1  LATHAM & WATKINS LLP
      Daniel Scott Schecter (SBN 171472)
2     Colin B. Vandell (SBN 240653)
   633 West Fifth Street, Suite 4000
3  Los Angeles, CA 90071-2007
   Telephone: (213) 485-1234
4  Facsimile: (213) 891-8763

5  Attorneys for Non-Party Deponent Steve Jobs

6

7                    UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9

10

11  IN THE MATTER OF A DEPOSITION        Case No. _____
    SUBPOENA SERVED IN:

12  F.B.T. PRODUCTIONS, LLC AND EM2M,    [Related to Case No. CV07-3314 PSG (MANx)
    LLC,                                 (C.D. Cal.)]
13
                  Plaintiffs,
14                                        DECLARATION OF COLIN B. VANDELL
        v.                                IN SUPPORT OF MOTION FOR
15                                        PROTECTIVE ORDER
    AFTERMATH RECORDS, INTERSCOPE
16  RECORDS, UMG RECORDING, INC.,        [Notice of Motion for Protective Order;
    AND ARY, INC.,                       Memorandum of Points and Authorities;
17                                        Declaration of Kevin Saul; and Exhibits filed
                  Defendants.             concurrently herewith]
18
                                          Hearing: [To Be Set By Court]
19                                        Date:     TBD
                                          Time:     TBD
20                                        Place:    Courtroom TBD
                                                    280 South 1st Street
21                                                  San Jose, CA 95113

22

23

24

25

26

27

28

LATHAM & WATKINS LLP    LA\1829181
 ATTORNEYS AT LAW
   LOS ANGELES

DECLARATION OF COLIN B. VANDELL IN
SUPPORT OF MOTION FOR PROTECTIVE ORDER

FILED

2008 MAR 24  P 3: 13

RICHARD W. WIEKING
       CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

RMW

CV 08 - 8 0 0 4 0 MISC.
                    PVT



## DECLARATION OF COLIN B. VANDELL

(1)    I am an attorney at the law firm of Latham & Watkins LLP, counsel to non-party Apple Inc. ("Apple") in the above-captioned matter, and am licensed to practice law in the State of California. I have personal knowledge of the matters set forth herein, and would competently testify thereto under oath if called as a witness. I submit this Declaration in support of the filing of Apple's motion for protective order to prevent Plaintiffs F.B.T. Production, LLC's and Em2M, LLC's ("Plaintiffs'") deposition of Apple chief executive officer Steve Jobs.

(2)    The underlying proceeding, *F.B.T. Productions, LLC v. Aftermath Records*, Case No. CV07-3314 PSG (MANx) (C.D. Cal.) (the "FBT Action"), was commenced by Plaintiffs on May 21, 2007 against Defendants Aftermath Records, Interscope Records, UMG Recordings, Inc., and Ary, Inc. (the "UMG Defendants"), asserting claims for breach of contract and declaratory judgment.

(3)    Plaintiffs filed a First Amended Complaint ("FAC") on June 13, 2007, again asserting breach of contact and declaratory judgment claims. (Attached hereto as Exhibit A ("Ex. A") is a true and correct copy of the FAC.)

(4)    The gravamen of the FAC is that the UMG Defendants have underpaid royalties to Plaintiffs with respect to master recordings of performances by Marshall Mathers, professionally known as Eminem. (Ex. A.)

(5)    Plaintiffs allege that the UMG Defendants should pay Plaintiffs royalties for digital distribution of Eminem's recordings (the "Eminem Masters") under the "licensing" provisions of agreements between Plaintiffs and the UMG Defendants (the "UMG Agreements"). Instead, the UMG Defendants have allegedly calculated the royalties under the less favorable "distribution" provisions of the UMG Agreements. (Ex. A.)

(6)    The only reference to Apple in the FAC is the allegation that the UMG Defendants "licensed" the Eminem Masters for distribution via Apple's iTunes service (and similarly to numerous other digital service providers), and that iTunes' and other digital service providers' sale of the Eminem Masters should yield a 50% royalty rate for Plaintiffs under the various UMG Agreements. (Ex. A.)

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
LA\1829181

2    DECLARATION OF COLIN B. VANDELL IN
SUPPORT OF MOTION FOR PROTECTIVE ORDER

1      (7)    On January 11, 2008, Plaintiffs issued a subpoena for documents from

2  Apple (the "Apple Document Subpoena") with numerous broad, irrelevant, and vague requests.

3  (Attached hereto as Exhibit B ("Ex. B") is a true and correct copy of the Apple Document

4  Subpoena.)

5      (8)    The Apple Document Subpoena was served on Apple in violation of

6  Federal Rule of Civil Procedure 45; no prior notice was provided to Defendants.  (Attached

7  hereto as Exhibit C ("Ex. C") is a true and correct copy of a letter from UMG Defendants'

8  counsel to Plaintiffs' counsel, dated Jan. 22, 2008, that details the violation.)

9      (9)    The Apple Document Subpoena demanded, *inter alia*, any and all

10  agreements – and all communications and other documents relating in any way to such

11  agreements – between Apple and UMG regarding music distribution.  (Ex. B.)

12      (10)    Apple has conferred numerous times with Plaintiffs in a good faith attempt

13  to resolve the overbreadth of the Apple Document Subpoena.

14      (11)    In connection with the meet and confer process regarding the Apple

15  Document Subpoena, Apple offered to provide, subject to protective order, the agreements

16  between Apple and any of the UMG Defendants (and any amendments) which pertain to

17  distribution of the Eminem Masters (the "Digital Music Download Sales Agreements," or

18  "Download Agreements").

19      (12)    Plaintiffs have indicated their intention to file a motion to compel further

20  responses to the Apple Document Subpoena in the Central District of California.

21      (13)    During the meet and confer process that followed Plaintiffs' service of a

22  deposition subpoena on Steve Jobs (the "Jobs Deposition Subpoena"), Plaintiffs' sole

23  explanation for the relevance of Mr. Jobs's deposition is the fact that he authored the essay

24  *Thoughts on Music.*  (Attached hereto as Exhibit D ("Ex. D") is a true and correct copy of the

25  Jobs Deposition Subpoena.  Attached hereto as Exhibit E ("Ex. E") is a true and correct copy of

26  the essay *Thoughts on Music.*)

27

28

1            (14)    Plaintiffs claim that the deposition of Mr. Jobs would seek to explore Mr.

2    Jobs's interpretation of the term "license" that is mentioned once in the *Thoughts on Music*

3    essay.

4            I declare under penalty of perjury under the laws of the State of California that the

5    foregoing is true and correct.

6            Executed this 24th day of March, 2008 in Los Angeles, California.

7

8                                _____

9                                   Colin B. Vandell

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES    LA\1829181

4

**Exhibit A**

2008-FEB-14  14:17                                    +2132539413        T-816  P.002/018  F-132



1    Richard S. Busch (TN Bar No. 014594)
2    *Pro Hac Vice Pending*
     KING & BALLOW
3    315 Union Street, Suite 1100
4    Nashville, TN 37201
5    (615) 259-3456   Facsimile: (615) 726-5417

6    Paul H. Duvall (State Bar No. 73699)
     KING & BALLOW
7    9404 Genesee Avenue, Suite 340
8    La Jolla, CA 92037-1355
9    (858) 597-6000   Facsimile: (838) 597-6008

10   Mark L. Block (State Bar No. 115457)
11   Christensen, Glaser, Fink, Jacobs, Weil, & Shapiro, LLP
     10250 Constellation Blvd., 19th Floor
12   Los Angeles, CA 90067
13   (310) 553-3000  Facsimile: (310) 556-2920

14   Attorneys for Plaintiffs F.B.T. Productions, LLC and Em2M, LLC

15           **UNITED STATES DISTRICT COURT**
16           **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 17   F.B.T. PRODUCTIONS, LLC, <br> 18   and Em2M, LLC, <br><br> 19       Plaintiffs, <br> 20   v. <br><br> 21   AFTERMATH RECORDS doing <br> 22   business as AFTERMATH <br> 23   ENTERTAINMENT; <br>     INTERSCOPE RECORDS; <br> 24   UMG RECORDINGS, INC.; and <br> 25   ARY, INC., <br><br> 26       Defendants. | **Case No. CV 07-03314 PSG (MANx)** <br><br> **FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT; DECLARATORY JUDGMENT** <br><br> **JURY DEMAND** |

DOCKETED ON CM
JUN 1 4 2007
BY _____ 009

27

28

1

Plaintiffs F.B.T. Productions, LLC, and Em2M, LLC (collectively "Plaintiffs"), by and through their attorneys, for their Complaint against the Defendants named above allege as follows:

## I. NATURE OF THE ACTION

1.      This action for breach of contract and declaratory judgment against Defendants named herein arises from Defendants' failure to properly account to and pay Plaintiffs royalties with respect to master recordings of the musical performances by Marshall B. Mathers III professionally known as Eminem ("Eminem") licensed from Defendants by various "Music Download Providers" for reproduction and sale as more fully described hereinbelow (including but not limited to iTunes, Buy.com, Napster, among others) and by "Mastertone Providers" (including but not limited to Cingular Wireless, Sprint, T-Mobile, and certain affiliates of Defendants, among others).

2.      This action seeks remedies for Defendants' knowing violations of the terms of their agreements with Plaintiffs whereby Defendants have paid Plaintiffs significantly less royalties than are owed to Plaintiffs for the licensing of the master recordings to Music Download Providers and Mastertone Providers.

3.      Plaintiffs seek damages for breach of contract. Plaintiffs further seek a declaration, pursuant to 28 U.S.C. §2201, that Defendants are obligated to pay Plaintiffs an amount equal to fifty percent (50%) of Defendants' net receipts from

2

the sale of records or other uses of the master sound recordings which are licensed by Defendants or Defendants' licensees to others for their manufacture and sale of records or for any other uses.

4.    Defendants' recording agreements with Plaintiffs require Defendants to pay Plaintiffs fifty percent (50%) of all net receipts received by Defendants on masters licensed by Defendants or Defendants' licensees to others for their manufacture and sale of records or for any other use.

5.    Rather than paying Plaintiffs fifty percent (50%) of the net receipts paid to Defendants for the licensed digital uses of master recordings featuring Eminem's performances, Defendants wrongfully (a) calculate royalties by applying an album royalty rate to an artificially imputed retail price of the download without a packaging or configuration deduction; (b) incorrectly compute domestic digital download sales using a fabricated retail price of 130% of wholesale price rather than the retail price actually charged to consumers by the licensees; and (c) apply territory reductions to so-called foreign digital download sales without an economic or contractual basis for such reductions.

6.    As a result of Defendants' intentional past and continuing contractual breaches, Plaintiffs have been damaged by the loss of royalty payments in excess of the jurisdictional limits of this Court which royalty payments Defendants have retained for their own benefit.

3

7.    Plaintiffs seek compensatory damages, attorneys' fees and other costs, and a judgment declaring Plaintiffs' rights pursuant to the recording agreements with Defendants and the proper method of calculating royalty payments or crediting royalty accounts with respect to licensed digital uses of the applicable master recordings by third party Music Download Providers, Mastertone Providers and others, and requiring that Defendants adhere to the proper method of calculating such royalties in the future.

## PARTIES

8.    Plaintiff F.B.T. Productions LLC ("F.B.T.") is a Michigan limited liability company.  The only members comprising F.B.T. are Mark Bass and Jeff Bass.   Both members are natural persons and United States citizens.   Both members are residents of Michigan and intend to reside in Michigan permanently, and therefore are domiciled in Michigan.  F.B.T. is a citizen of Michigan.

9.    Plaintiff Em2M LLC ("Em2M") is a Michigan limited liability company.  Joel Martin, a natural person, is the sole member of Em2M.  Mr. Martin is a United States citizen and a resident of the State of Michigan.  He intends to reside in Michigan permanently, and therefore is domiciled in Michigan.  Em2M is a citizen of Michigan.

### Defendant Aftermath Records

10.    Defendant Aftermath Records and Aftermath Records doing business

4

1   as Aftermath Entertainment ("Aftermath") is a joint venture between three entities:

2   (1) Interscope Records, a California general partnership (the "Interscope

3

4   Partnership"), (2) Interscope Records, an unincorporated division of UMG

5   Recordings, Inc., a Delaware corporation authorized to do business in the State of

6

7   California ("UMG"), and (3) ARY, Inc., a California corporation ("ARY"). The

8   Interscope Records, a Partnership, is a general partnership comprised of three

9   entities: (a) Interscope Records, an unincorporated division of UMG, (b) UMG,

10

11  and (c) PRI Productions, Inc., a Delaware Corporation. Based on the citizenship of

12  the entities of the joint venture, Aftermath Entertainment is a citizen of California

13

14  and Delaware.

15          a.    UMG is organized under the laws of the State of Delaware and

16  is a citizen of that state, as is its unincorporated division, Interscope Records.

17

18  UMG Recordings and its divisions also are citizens of the state that is UMG's

19  principal place of business, which is California.   According to its website,

20

21  "UMG's corporate headquarters are located at 2220 Colorado Avenue, Santa

22  Monica, CA 90404 and 1755 Broadway, New York, NY 10019." According to its

23

24  registration on file with the California Secretary of State, UMG is registered in the

25  State of Delaware and its offices are located at "10 Universal City Plaza, Universal

26

27  City, California, 91608." Lastly, UMG's critical copyright and licensing

28  department and its Film & TV Licensing departments are stationed in California as

well. On information and belief, Plaintiffs allege that UMG employs a majority of its employees in California, and the majority of its executive and administrative functions are performed in California because (a) at least one of its two headquarters are located in California, (b) UMG's critical licensing and copyright divisions are located in California, and (c) a majority of its operations, both executive and administrative, take place in California.

      b.    PRI Productions, Inc., (hereinafter, "PRI") is a Delaware Corporation registered to do business in California. PRI's principal place of business is California. It lists its address with the California Secretary of State as "10 Universal City Plaza, Universal City, CA, 91608." This address is the exact same address as UMG registered with the California Secretary of State. On information and belief, Plaintiffs allege that PRI is involved in the entertainment and music industries and performs the majority of its operations in California in concert with UMG. Additionally, Plaintiffs allege on investigation and discovery that PRI has no executive and no administrative staff operating outside of California. All of its operations therefore take place in California. It is a citizen of California and Delaware.

      11.    Interscope Records, a Partnership, is comprised of UMG and PRI, and is a citizen of Delaware and California because UMG and PRI are both citizens of Delaware and California.

6

12.    Interscope Records, an unincorporated division of UMG, is legally indistinguishable from UMG, and its citizenship is the same as UMG.   As explained above, UMG is a citizen of Delaware and California.

13.    ARY is a registered California Corporation.   Plaintiffs allege on information and belief that ARY is owned and operated solely by Andre Rommel Young, Jr., professionally known as the hip-hop artist "Dr. Dre."   The principal place of business of ARY is California.   Its registered mailing address is 10100 Santa Monica Blvd., Suite 1300, Los Angeles, California 90067.   ARY lists its agent for service of process as Howard King of the law firm King, Holmes, Paterno & Berliner, LLP, located at 1900 Avenue of the Stars, 25th Floor, Los Angeles, California 90067.   On information and belief, Plaintiffs allege that Mr. Young lives in California and runs ARY exclusively from California.   Also on information and belief, Plaintiffs allege that ARY has no employees other than Andre R. Young, Jr. and has no assets and no operations outside of California. ARY's principal place of business is California, and ARY is a citizen of California.

14.    Defendant Aftermath is a citizen of California and Delaware.

15.    For purposes of diversity jurisdiction, Defendants Aftermath, the Interscope Partnership and UMG are all citizens of Delaware and California. Defendant ARY, Inc., is a citizen of California.   Plaintiffs, as citizens of Michigan, are diverse from Defendants' citizenship.

## JURISDICTION AND VENUE

16.    The jurisdiction of this Court is based upon 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.  This action for declaratory judgment is brought pursuant to 28 U.S.C. §2201 which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. §1331. Venue is proper in this District pursuant to 28 U.S.C. §§1391 and 1400(a).

17.    Personal jurisdiction over each of the Defendants is proper in this Court, among other reasons, on the grounds that (a) Defendants and/or Defendants' agents transact business in the State of California; (b) Defendants' wrongful conduct alleged herein occurred in the State of California and this District; and (c) the Agreements that are the subject of this action were entered into in this District.

18.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(c).

## GENERAL ALLEGATIONS

19.    On November 28, 1995, F.B.T. entered into an Exclusive Artist's Recording Agreement with Eminem ("1995 Agreement").  The 1995 Recording Agreement between F.B.T. and Eminem subsequently was amended on November 5, 1998, February 22, 1999 and November 28, 1999.

20.    On March 9, 1998 F.B.T. and Aftermath entered into a written

8

agreement whereby F.B.T. agreed to furnish to Aftermath the exclusive recording

services of "Eminem." ("March 9, 1998 Agreement")  On March 9, 1998, Eminem

also entered into a Letter of Inducement with Aftermath whereby Eminem

acknowledged and approved of the agreement between F.B.T. and Aftermath for

Eminem's exclusive recording services. ("Letter of Inducement")

    21.    On September 27, 2000, F.B.T., Eminem and Aftermath entered into a

novation of the March 9, 1998 Agreement between F.B.T. and Eminem whereby

F.B.T. assigned all of its rights under the March 9, 1998 Agreement to Eminem,

Eminem assumed all of F.B.T's rights and obligation to Aftermath, and Aftermath

assumed F.B.T.'s obligations to Eminem so that Eminem would have a direct

relationship with Aftermath effective September 27, 2000 ("Novation").  Pursuant

to the Novation, F.B.T. irrevocably directed Aftermath to compute, account and

pay directly to Joel Martin, twenty-five percent (25%) of the monies payable to

F.B.T. under the Novation at the same times and on the same basis as Aftermath

accounts to F.B.T.  All parties expressly agreed Joel Martin is a third party

beneficiary under the Novation.

    22.    Pursuant to the terms of the Novation, among other things, F.B.T.

remained an income participant with respect to all master recordings released by

Aftermath under the Novation and to which F.B.T. would have had rights prior to

the execution of the Novation (for purposes of this Complaint, the "Eminem

13

Masters"). Further, pursuant to the terms of the Novation, the 1995 Recording Agreement with its three subsequent modifications as well as the March 9, 1998 Agreement and Letter of Inducement were affirmed by the parties. One of the terms of the Novation provided that the royalties owed by Aftermath pursuant thereto were to be divided between F.B.T. and Eminem.

23. On or about August 22, 2003 and effective as of July 2, 2003, a new agreement was entered into between Aftermath and Eminem regarding, among other things, the Eminem Masters ("2003 Agreement"). Pursuant to the terms of the 2003 Agreement, all "Prior Agreements" are affirmed expressly including (a) the 1995 Recording Agreement and amendments thereto; (b) the March 9, 1998 Agreement and Letter of Inducement; and (c) the September 27, 2000 Novation.

24. On September 20, 2004, Joel Martin assigned all of his interests in and to the 2000 Novation and under the 2003 Agreement to Em2M LLC, and all payments and accountings otherwise due to Joel Martin thereafter were due to be made by Defendants to Em2M LLC.

25. On November 1, 2004, F.B.T. and Eminem, on the one hand, and Aftermath, on the other hand, entered into a written modification of the Novation ("2004 Amendment").

26. Pursuant to the terms of the foregoing agreements referenced hereinabove, F.B.T. and Eminem caused certain recorded performances of Eminem

10

1  to be delivered to Defendants, and Defendants agreed to manufacture, distribute,

2  sell, and license for sale and distribution those master recordings in various

3

4  configurations throughout the Universe.

5      27.    Plaintiffs have each performed their respective material obligations

6

7  pursuant to the terms of each of the agreements referenced hereinabove.

8      28.    Pursuant to the terms of the March 9, 1998 Agreement and the 2003

9

10  Agreement, Defendants were to provide certain remuneration to Plaintiffs,

11  including royalties, and to furnish Plaintiffs with semi-annual royalty accounting

12  statements setting forth the computations of each Plaintiff's entitlement to royalties

13

14  for the commercial exploitation of the Eminem Masters, which statements were to

15  be accompanied by any royalty payments due.

16      29.    Pursuant to the terms of the March 9, 1998 Agreement and the 2003

17

18  Agreement, Defendants agreed to pay certain royalties as follows:  "On masters

19  licensed by us or our Licensees to others for their manufacture and sale of records

20

21  or for any other use, your royalty shall be an amount equal to fifty percent (50%)

22  of our net receipts from the sale of those records or from those other uses of the

23

24  masters."  The "other uses" of the Eminem Masters include, without limitation,

25  Defendants, or Defendants' [L]icensees, licensing to various Music Download

26

27  Providers and Mastertone Providers for digital uses, including digital downloads,

28  digital streaming and mastertones.  The identities of each of the Music Download

Providers and Mastertone Providers are known exclusively to Defendants.

30. Under the agreements entered into between Plaintiffs and Defendants, Defendants were obligated to act in good faith in their dealings with Plaintiffs and to render accurate royalty accounting statements, and to properly credit and account for the royalties generated by the commercial exploitation of the Eminem Masters.

31. During the period January 1, 2002 to present, Defendants or Defendants' licensees have licensed the Eminem Masters to various Music Download Providers including but not limited to iTunes, Buy.com, Napster, among others, and Mastertone Providers (including but not limited to Cingular Wireless, Sprint, T-Mobile, and certain affiliates of Defendants, among others).

32. Upon information and belief, Defendants' agreements with the Music Download Providers and Mastertone Providers involve the licensing of the Eminem Masters to such Music Download Providers and Mastertone Providers for sale in the form of digital music files which is encompassed in the definition of "other uses of the masters" as set forth in the March 9, 1998 Agreement and the 2003 Novation.

33. In 2005, F.B.T. and Eminem retained an accounting firm to review the accounting records of Defendants and to perform a royalty audit on behalf of Plaintiffs for the periods January 1, 2002 through and including June 30, 2005. On

12

February 10, 2006, the accounting firm submitted its audit report to Defendants. As a result, the February 10, 2006 audit showed, among other things, that Plaintiffs, collectively, have been underpaid by Defendants for the digital uses in an amount in excess of $650,000.

### FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

34.    Plaintiffs reallege each and every allegation in Paragraphs 1 through 33 hereof as if fully set forth herein.

35.    Defendants have failed to comply with the terms of the March 9, 1998 Agreement and the 2003 Agreement by failing to account and pay Plaintiffs fifty percent (50%) of Defendants' net receipts from the digital uses of the Eminem Masters by the Music Download Providers and Mastertone Providers. Defendants apply an incorrect formula for calculating royalties with respect to those royalties to be paid to Plaintiffs which results in Plaintiffs collectively receiving an average royalty of approximately twelve percent (12%) instead of the fifty percent (50%) required by the terms of the agreements.

36.    On February 21, 2007, and pursuant to paragraph 15(b) of the March 9, 1998 Agreement and the 2003 Agreement, Plaintiffs sent written notice to Defendants by certified mail, return receipt requested, advising Defendants of their breach of said agreements and requesting that Defendants cure the breach within thirty (30) days after the date of the notice.

13

37.   Despite said notice, Defendants have failed and refused to cure the breach and continue to incorrectly calculate royalties in violation of the March 9, 1998 Agreement and 2003 Agreement.  As a result of Defendants' improper calculation of royalties, Defendants have further breached said agreements by their failure (a) to account properly, (b) to credit and pay the correct amount of royalties due to Plaintiffs; and (c) to render royalty statements reflecting the correct amount of royalties due to Plaintiffs.

38.   By reason of the foregoing and other acts not presently known by Plaintiffs, Defendants have knowingly and materially breached its contractual obligations to Plaintiffs under the March 9, 1998 Agreement and the 2003 Agreement, and wantonly have disregarded the rights of Plaintiffs.

39.   Pursuant to the terms of the 2003 Agreement, should any party institute any action or proceeding at law or in equity to enforce any provision of the 2003 Agreement, including an action for declaratory relief, or for damages by reason of an alleged breach of any provision of the 2003 Agreement, or otherwise in connection with the 2003 Agreement or any of its provisions, the prevailing party is entitled to recover from the non-prevailing party reasonable and actual attorneys' fees and costs for services rendered to the prevailing party in such action or proceeding.

40.   As a result of the wrongful conduct of Defendants alleged

14

hereinabove, Plaintiffs have been damaged in an amount to be determined at the time of trial, which upon information and belief is well in excess of one million dollars ($1,000,000) for the digital uses.

## SECOND CAUSE OF ACTION
## (DECLARATORY JUDGMENT)

41.    Plaintiffs reallege each and every allegation in Paragraphs 1 through 40 hereof as if fully set forth herein.

42.    Pursuant to 28 U.S.C. §2201, this Court may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is, or could be, sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

43.    Plaintiffs contend, and seek a declaration, that, pursuant to the March 9, 1998 Agreement and the 2003 Agreement, Defendants are obligated to pay Plaintiffs, collectively, fifty percent (50%) of Defendants' net receipts derived from the licensing by Defendants or Defendants' Licensees to others "for their manufacture and sale of records or for any other uses" of the Eminem Masters, including, without limitation, Music Download Providers and Mastertone Providers, the identities of which are known exclusively by Defendants. Defendants deny they have such an obligation under said agreements.

44.    Plaintiffs have no adequate remedy at law.

45.    By reason of the foregoing, there is a present controversy between

15

Plaintiffs and Defendants for which a declaratory judgment should be entered

determining that the March 9, 1998 Agreement and the 2003 Agreement obligates

Defendants to pay Plaintiffs, collectively, fifty percent (50%) of Defendants' net

receipts from the licensing by Defendants or Defendants' Licensees of the Eminem

Masters to Music Download Providers and Mastertone Providers for sale.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a jury trial against Defendants on those

matters to be determined by a jury and further pray for judgment against

Defendants, and each of them, as follows:

1.    On the First Cause of Action, judgment awarding Plaintiffs

compensatory damages, the exact amount is to be determined at the time of trial;

2.    On the Second Cause of Action, an order and judgment declaring that

the March 9, 1998 Agreement and the 2003 Agreement obligates Defendants to

pay Plaintiffs, collectively, fifty percent (50%) of Defendants' net receipts from the

licensing by Defendants or Defendants' Licensees to Music Download Providers,

Mastertone Providers, and others for digital and other licensed uses of the Eminem

Masters, including, without limitation, digital downloads, digital streaming and

digital mastertones;

3.    An award of reasonable and actual attorneys' fees and costs for

services rendered to Plaintiffs in this action;

16

4.    An award of pre- and post-judgment interest;

5.    Such other and further relief as the Court deems just and proper.

DATED: June 12, 2007                    Respectfully submitted,

KING & BALLOW

Richard S. Busch (TN Bar No. 014594)
*Pro hac vice pending*
Paul H. Duvall (State Bar No. 73699)
9404 Genesee Avenue, Suite 340
La Jolla, CA 92037-1355
Telephone:  (858) 597-6000
Facsimile:  (838) 597-6008
pduvall@kingballow.com
rbusch@kingballow.com

Mark Block (State Bar No. 115457)
Christensen, Glaser, Fink, Jacobs, Weil, &
Shapiro, LLP
10250 Constellation Blvd. 19th Floor
Los Angeles, CA 90067
Telephone:  (310) 282-6240
Facsimile: (310) 556-2920
mblock@chrisglase.com

Attorneys for Plaintiffs

17

**Exhibit B**

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the
# United States District Court
### Northern District of California

F.B.T. Productions, LLC, et al.

v.

Aftermath Records, et al.

**SUBPOENA IN A CIVIL CASE**
Case No. CV 07-3314 PSG (MANx)
**Central District of California**

TO:   Custodian of the Records
Apple Computers, Inc.
1 Infinite Loop
Cupertino, CA 95014

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| | |
|---|---|
| Nogara Reporting Service<br>130 Battery Street, Suite 580<br>San Francisco, CA 94111 | January 28, 2008<br>10:00 A.M. |

See Exhibit A.

| PLACE | DATE AND TIME |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | | DATE |
|---|---|---|
| *Richard Busch* Attorney | Plaintiff | 1/11/08 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Richard S. Busch, Esq.
King & Ballow
315 Union Street
1100 Union Street Plaza
Nashville, TN 37201
(615) 259-3456

## SCHEDULE A

### I. Definitions

A.    "You" or "Apple" refers to Apple Computer Inc. its agents, representatives, attorneys, and/or any other persons acting or purporting to act on its behalf.

B.    "RIAA" shall mean the Recording Industry Association of America (RIAA), its agents, representatives, attorneys, and/or any other persons acting or purporting to act on its behalf.

C.    "Aftermath" refers to Aftermath Records d/b/a Aftermath Entertainment its agents, representatives, attorneys, and/or any other persons acting or purporting to act on its behalf.

D.    "Interscope" refers to Interscope Records its agents, representatives, attorneys, and/or any other persons acting or purporting to act on its behalf.

E.    "UMG" or "Universal" refers to UMG Recordings, Inc., its parent company, its subsidiaries, its affiliates, and any other related company, as well as their agents, representatives, attorneys, and/or any other persons or entities acting or purporting to act on their behalf.

F.    "ARY" refers to ARY, Inc. its agents, representatives, attorneys, and/or any other persons acting or purporting to act on its behalf.

G.    "Document," "Electronically Stored Information," and "Things" are

1

defined to be synonymous in meaning and equal in scope to the usage of these terms in FRCP Rule 34. A draft or non-identical copy is a separate document, electronically stored information, or thing within the meaning of this term.

H.    "Communication" shall mean any transmission of information by oral, graphic, written, pictorial, or other perceptible means, including, but not limited to, telephone conversations, letters, documents, memoranda, notes, telegrams, facsimile, transmissions, electronic mail, meetings, and personal conversations.

I.    "And" and "or" each shall be construed either conjunctively or disjunctively as necessary to bring within the scope of these requests for production of documents, electronically stored information, and things any information or document that might otherwise be construed to be outside its scope.

J.    References to the plural shall include the singular; references to the singular shall include the plural.

K.    References to the feminine shall include the masculine; references to the masculine shall include the feminine.

L.    All legal terms, accounting terms, and other technical terms associated with a particular industry, profession or identifiable body of knowledge shall have the meanings customarily and ordinarily associated with those terms with those terms within that industry, profession or discipline.

## II. DOCUMENT, ELECTRONICALLY STORED INFORMATION, AND THINGS REQUESTS

2

24

1.    Each and every document that in any way refers to, relates to, or pertains to the formation of the agreements between you and Universal, or any other record company, for the distribution of music in digital format, including but not limited to, the efforts between yourself, the RIAA, and/or any other third party to draft, structure, or characterize such agreements as reseller agreements or otherwise, and not license agreements.

2.    Each and every communication between yourself and the RIAA that in any way relates to, refers to, or pertains to any efforts to draft, structure, or characterize the agreements between yourself and Universal as reseller agreements or otherwise, and not license agreements.

3.    Each and every communication between yourself, Universal, and/or any other third party that in any way relates to, refers to, or pertains to any efforts to draft, structure, or characterize the agreements between yourself and Universal as reseller agreements or otherwise, and not license agreements.

4.    All drafts of the document entitled "Thoughts On Music," or documents and communications related thereto, authored by Steve Jobs, and released on February 6, 2007.

5.    Each and every document that identifies music as an "iTunes digital release," "iTunes release," or a release by iTunes.

6.    Each and every internal document or record referencing Universal or

3

other record company, or other rights owner, in which such entity is characterized as a licensor.

7. Each and every agreement in which iTunes obtained the rights to release or sell an artist's music through an agreement directly with an artist, or its representatives, even if Universal or other record company also executed such agreement.

8. Each and every agreement in which iTunes obtained the rights to release or sell an artist's music through an agreement directly with the owner, publisher, or administrator of the copyright in the underling musical composition, or their representatives, even if Universal or other record company also executed such agreement, including but not limited to all mechanical licenses.

9. Each and every document referencing or relating to all downloads of the Eminem Masters, including but not limited to any financial information related thereto.

4

**Exhibit C**

# MUNGER, TOLLES & OLSON LLP

355 SOUTH GRAND AVENUE
THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

560 MISSION STREET
SAN FRANCISCO, CALIFORNIA 94105-2907
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

January 22, 2008

WRITER'S DIRECT LINE
(213) 683-9238
(213) 683-4038 FAX
Kelly.Klaus@mto.com

**BY E-MAIL AND U.S. MAIL**

Richard S. Busch, Esq.
King & Ballow
315 Union Street
1100 Union Street Plaza
Nashville, Tennessee 37201

Re: *F.B.T. Productions, LLC et al. v. Aftermath Records et al.*, Case No. CV
07-3314-PSG (C.D. Cal.)

Dear Mr. Busch:

We have become aware that you have been serving subpoenas on third parties in
the above-referenced case without complying with your obligations under Rule 45 to provide
notice of the subpoenas to us.

We are aware of four apparent instances of your violating Rule 45 in this manner:
your subpoena to the Recording Industry Association of American, your subpoena to Apple Inc.,
and your two subpoenas to MusicNet. We only became aware of the subpoenas to MusicNet
because your office inadvertently mailed the originals of these subpoenas to us. We still have
not received the notice that Rule 45(b)(1) requires for any subpoenas you have issued.

Among other things, the notice rule allows parties to the case an opportunity to
object to a requested production. *See* 1991 Adv. Comm. Note to Subdivision (b); *Butler v.
Biocore Med. Techs., Inc.*, 348 F.3d 1163, 1173 (10th Cir. 2003). Your failure to provide the
required notice threatens defendants' rights. The Court may strike your subpoenas or impose

4310586.1



MUNGER, TOLLES & OLSON LLP
Richard S. Busch, Esq.
January 22, 2008
Page 2

other sanctions on account of your violations. *See Florida Media, Inc. v. World Publs., LLC*, 236 F.R.D. 693, 695 (M.D. Fla. 2006). Our clients do not waive, but rather expressly reserve, all of their rights to relief on account of your non-compliance with the Rules to date.

If you have served any subpoenas without giving us notice under Rule 45(b)(1), please notify us immediately of the relevant parties and send us copies of all papers you have served on them. Please comply with the Rules on a going-forward basis.

Finally, as you know from your representation of the plaintiff LLCs in the *Eight Mile v. Apple* action, we represent Apple in that case. Your subpoena to Apple in this case obviously concerns matters related to the *Eight Mile* action. Your attempt to communicate directly with Apple on matters that obviously are related to that litigation may be a violation of the rules of professional conduct. Please be sure that this does not happen again.

As requested by your office, we are returning the originals of the four subpoenas referenced above with the original of this letter. Thank you for your immediate attention to these matters.

Sincerely,

Kelly M. Klaus

Enclosures (with mailed copy only)

4310186.1

**Exhibit D**

1  Richard S. Busch (TN Bar No. 014594)
   *Attorney Pro Hac Vice*
2  KING & BALLOW
3  315 Union Street, Suite 1100
   Nashville, TN 37201
4  (615) 259-3456    Facsimile: (615) 726-5417
5
   Paul H. Duvall (State Bar No. 73699)
6  KING & BALLOW
7  9404 Genesee Avenue, Suite 340
   La Jolla, CA 92037-1355
8  (858) 597-6000    Facsimile: (838) 597-6008
9
10  Mark L. Block (State Bar No. 115457)
    Christensen, Glaser, Fink, Jacobs, Weil, & Shapiro, LLP
11  10250 Constellation Blvd., 19th Floor
12  Los Angeles, CA 90067
13  (310) 553-3000  Facsimile: (310) 556-2920
    Attorneys for Plaintiffs F.B.T. Productions, LLC and Em2M, LLC
14

15              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
16

| | |
|---|---|
| 17  F.B.T. PRODUCTIONS, LLC, and Em2M, LLC, | ) ) |
| 18  | ) ) Case No. CV 07-3314 PSG (MANx) |
| 19  Plaintiffs, | ) ) |
| 20  v. | ) ) **NOTICE OF DEPOSITION OF** |
| 21  AFTERMATH RECORDS doing business as AFTERMATH | ) ) **STEVE JOBS** |
| 22  ENTERTAINMENT; | ) ) |
| 23  INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and | ) ) |
| 24  ARY, INC., | ) ) |
| 25  | ) ) |
| 26  Defendants. | ) ) |
| 27  | ) |

28

1

TO ALL DEFENDANTS AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, Plaintiffs F.B.T. Productions, LLC, and Em2M, LLC will take the deposition upon oral examination of Steve Jobs.

The deposition will take place on **March 27, 2008,** at 9:00 am P.S.T. at the offices of Latham & Watkins, LLP, 140 Scott Drive, Menlo Park, CA 94025, and continue from day to day, Sundays and holidays excluded, until completed, before a notary public or other officer authorized to administer oaths. Pursuant to Rule 30(b)(2), the deposition shall be recorded by videographic and stenographic means.

DATED: March 3, 2008                    Respectfully submitted,


                                        KING & BALLOW



                                        Richard S. Busch (TN Bar No. 014594) w/ permission
                                        Paul H. Duvall (State Bar No. 73699)
                                                    – and –
                                        Mark Block (State Bar No. 115457)
                                        Christensen, Miller, Fink, Jacobs, Glaser


                                        Attorneys for Plaintiffs

2

## CERTIFICATE OF SERVICE

1   **STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**

2      I, Sherie Johnson, declare:

3      I am employed in the County of San Diego, State of California. I am over the

4   age of eighteen years, and not a party to the within action. My business address is

    9404 Genesee Avenue; Suite 340; La Jolla, CA 92037. On March 3, 2008, I

5   instructed First Legal Support Services to personally serve a true copy of the

6   attached documents entitled **NOTICE OF DEPOSITION OF STEVE JOBS** and

    **SUBPOENA IN A CIVIL CASE TO STEVE JOBS** upon:

| Glenn D. Pomerantz, Esq. | Daniel S. Schecter, Esq. |
|---|---|
| 7   Kelly M. Klaus, Esq. | Colin B. Vandell, Esq. |
| 8   Kimberly D. Encinas, Esq. | LATHAM & WATKINS |
| 9   MUNGER, TOLLES & OLSON LLP | 633 West Fifth Street, Suite 4000 |
| 10   355 South Grand Avenue, 35th Floor | Los Angeles, CA  90071-2007 |
|     Los Angeles, CA  90071-1560 | On behalf of Steve Jobs |
| 11   Attorneys for Defendants | |

12   I also instructed First Legal Support Services to prepare a Proof of Personal Service.

13

14      I also served a true copy of the attached documents entitled **NOTICE OF**

    **DEPOSITION OF STEVE JOBS** and **SUBPOENA IN A CIVIL CASE TO**

15   **STEVE JOBS** by placing same in an addressed sealed envelope clearly labeled to

16   identify the persons being served at the address shown below and placed said

17   envelope for collection with the United States Postal Service located at 9404

    Genesee Avenue; La Jolla, California 92037, on March 3, 2008, following ordinary

18   business practices:

| Glenn D. Pomerantz, Esq. | Daniel S. Schecter, Esq. |
|---|---|
| 19   Kelly M. Klaus, Esq. | Colin B. Vandell, Esq. |
| 20   Kimberly D. Encinas, Esq. | LATHAM & WATKINS |
|     MUNGER, TOLLES & OLSON LLP | 633 West Fifth Street, Suite 4000 |
| 21   355 South Grand Avenue | Los Angeles, CA  90071-2007 |
| 22   Thirty-Fifth Floor | On behalf of Steve Jobs |
|     Los Angeles, CA  90071-1560 | |
| 23   Attorneys for Defendants | |

24      I declare that I am employed in the office of a member of the bar of this Court

25   at whose direction the service was made. Executed on March 3, 2008, at La Jolla,

26   California.

27                                      _Sherie Johnson_
                                        Sherie Johnson

28

King &
Ballow

---

PROOF OF SERVICE                                CASE # CV 07-03314 PSG (MANX)

31

AO 88 (Rev. 1/94) Subpoena in a Civil Case

**Issued by the**

# United States District Court
### Northern District of California

F.B.T. Productions, LLC, et al.

v.

Aftermath Records, et al.

**SUBPOENA IN A CIVIL CASE**
Case No. CV 07-3314 PSG (MANx)
Central District of California

TO:     Steve Jobs, CEO Apple, Inc.
        c/o Daniel S. Schecter, Esq.
        Colin B. Vandell, Esq.
        Latham & Watkins, LLP
        644 West Fifth Street
        Suite 4000
        Los Angeles, CA 90071-2007

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Latham & Watkins, LLP<br>140 Scott Drive<br>Menlo Park CA 94025 | March 27, 2008<br>9:00 AM P.S.T. |

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|
| | |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| _Richd S Busch    for ARG_    Plaintiff | 3/3/08 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Richard S. Busch, Esq.
King & Ballow
315 Union Street
1100 Union Street Plaza
Nashville, TN 37201
(615) 259-3456

32

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE                                     SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C&D:

(c)      PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.
         (1)      A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.
         (2)(A)      A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
         (2)      Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.
         (3)(A)      On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
                  (i)      fails to allow reasonable time for compliance;
                  (ii)      requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
                  (iii)      requires disclosure of privileged or other protected matter and no exception or waiver applies, or
                  (iv)      subjects a person to undue burden.
         (3)      If a subpoena
                  (i)      requires disclosure of a trade secret or other confidential research, development, or commercial information, or
                  (ii)      requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
                  (iii)      requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.
(d)      DUTIES IN RESPONDING TO SUBPOENA.
         (1)      A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
         (2)      When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## CERTIFICATE OF SERVICE

1 **STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**

2       I, Sherie Johnson, declare:

3       I am employed in the County of San Diego, State of California. I am over the

4 age of eighteen years, and not a party to the within action. My business address is

5 9404 Genesee Avenue; Suite 340; La Jolla, CA 92037. On March 3, 2008, I
instructed First Legal Support Services to personally serve a true copy of the

6 attached documents entitled **NOTICE OF DEPOSITION OF STEVE JOBS** and
**SUBPOENA IN A CIVIL CASE TO STEVE JOBS** upon:

| | |
|---|---|
| Glenn D. Pomerantz, Esq. | Daniel S. Schecter, Esq. |
| Kelly M. Klaus, Esq. | Colin B. Vandell, Esq. |
| Kimberly D. Encinas, Esq. | LATHAM & WATKINS |
| MUNGER, TOLLES & OLSON LLP | 633 West Fifth Street, Suite 4000 |
| 355 South Grand Avenue, 35th Floor | Los Angeles, CA 90071-2007 |
| Los Angeles, CA 90071-1560 | On behalf of Steve Jobs |
| Attorneys for Defendants | |

12 I also instructed First Legal Support Services to prepare a Proof of Personal Service.

13

14       I also served a true copy of the attached documents entitled **NOTICE OF
DEPOSITION OF STEVE JOBS** and **SUBPOENA IN A CIVIL CASE TO

15 STEVE JOBS** by placing same in an addressed sealed envelope clearly labeled to

16 identify the persons being served at the address shown below and placed said
envelope for collection with the United States Postal Service located at 9404

17 Genesee Avenue; La Jolla, California 92037, on March 3, 2008, following ordinary

18 business practices:

| | |
|---|---|
| Glenn D. Pomerantz, Esq. | Daniel S. Schecter, Esq. |
| Kelly M. Klaus, Esq. | Colin B. Vandell, Esq. |
| Kimberly D. Encinas, Esq. | LATHAM & WATKINS |
| MUNGER, TOLLES & OLSON LLP | 633 West Fifth Street, Suite 4000 |
| 355 South Grand Avenue | Los Angeles, CA 90071-2007 |
| Thirty-Fifth Floor | On behalf of Steve Jobs |
| Los Angeles, CA 90071-1560 | |
| Attorneys for Defendants | |

24       I declare that I am employed in the office of a member of the bar of this Court

25 at whose direction the service was made. Executed on March 3, 2008, at La Jolla,

26 California.

27                                         _Sherie Johnson_
                                        -Sherie Johnson

28

King &
Ballow

---

PROOF OF SERVICE                                    CASE # CV 07-03314 PSG (MANx)

34

Exhibit E

# Thoughts on Music

Steve Jobs
February 6, 2007

With the stunning global success of Apple's iPod music player and iTunes online music store, some have called for Apple to "open" the digital rights management (DRM) system that Apple uses to protect its music against theft, so that music purchased from iTunes can be played on digital devices purchased from other companies, and protected music purchased from other online music stores can play on iPods. Let's examine the current situation and how we got here, then look at three possible alternatives for the future.

To begin, it is useful to remember that all iPods play music that is free of any DRM and encoded in "open" licensable formats such as MP3 and AAC. iPod users can and do acquire their music from many sources, including CDs they own. Music on CDs can be easily imported into the freely-downloadable iTunes jukebox software which runs on both Macs and Windows PCs, and is automatically encoded into the open AAC or MP3 formats without any DRM. This music can be played on iPods or any other music players that play these open formats.

The rub comes from the music Apple sells on its online iTunes Store. Since Apple does not own or control any music itself, it must license the rights to distribute music from others, primarily the "big four" music companies: Universal, Sony BMG, Warner and EMI. These four companies control the distribution of over 70% of the world's music. When Apple approached these companies to license their music to distribute legally over the Internet, they were extremely cautious and required Apple to protect their music from being illegally copied. The solution was to create a DRM system, which envelopes each song purchased from the iTunes store in special and secret software so that it cannot be played on unauthorized devices.

Apple was able to negotiate landmark usage rights at the time, which include allowing users to play their DRM protected music on up to 5 computers and on an unlimited number of iPods. Obtaining such rights from the music companies was unprecedented at the time, and even today is unmatched by most other digital music services. However, a key provision of our agreements with the music companies is that if our DRM system is compromised and their music becomes playable on unauthorized devices, we have only a small number of weeks to fix the problem or they can withdraw their entire music catalog from our iTunes store.

To prevent illegal copies, DRM systems must allow only authorized devices to play the protected music. If a copy of a DRM protected song is posted on the Internet, it should not be able to play on a downloader's computer or portable music device. To achieve this, a DRM system employs secrets. There is no theory of protecting content other than keeping secrets. In other words, even if one uses the most sophisticated cryptographic locks to protect the actual music, one must still "hide" the keys which unlock the music on the user's computer or portable music player. No one has ever implemented a DRM system that does not depend on such secrets for its operation.

The problem, of course, is that there are many smart people in the world, some with a lot of time on their hands, who love to discover such secrets and publish a way for everyone to get free (and stolen) music. They are often successful in doing just that, so any company trying to protect content using a DRM must frequently update it with new and harder to discover secrets. It is a cat-and-mouse game. Apple's DRM system is called FairPlay. While we have had a few breaches in FairPlay, we have been able to successfully repair them through updating the iTunes store software, the iTunes jukebox software and software in the iPods themselves. So far we have met our commitments to the music companies to protect their music, and we have given users the most liberal usage rights available in the industry for legally downloaded music.

With this background, let's now explore three different alternatives for the future.

The first alternative is to continue on the current course, with each manufacturer competing freely with their own "top to bottom" proprietary systems for selling, playing and protecting music. It is a

very competitive market, with major global companies making large investments to develop new music players and online music stores. Apple, Microsoft and Sony all compete with proprietary systems. Music purchased from Microsoft's Zune store will only play on Zune players; music purchased from Sony's Connect store will only play on Sony's players; and music purchased from Apple's iTunes store will only play on iPods. This is the current state of affairs in the industry, and customers are being well served with a continuing stream of innovative products and a wide variety of choices.

Some have argued that once a consumer purchases a body of music from one of the proprietary music stores, they are forever locked into only using music players from that one company. Or, if they buy a specific player, they are locked into buying music only from that company's music store. Is this true? Let's look at the data for iPods and the iTunes store – they are the industry's most popular products and we have accurate data for them. Through the end of 2006, customers purchased a total of 90 million iPods and 2 billion songs from the iTunes store. On average, that's 22 songs purchased from the iTunes store for each iPod ever sold.

Today's most popular iPod holds 1000 songs, and research tells us that the average iPod is nearly full. This means that only 22 out of 1000 songs, or under 3% of the music on the average iPod, is purchased from the iTunes store and protected with a DRM. The remaining 97% of the music is unprotected and playable on any player that can play the open formats. It's hard to believe that just 3% of the music on the average iPod is enough to lock users into buying only iPods in the future. And since 97% of the music on the average iPod was not purchased from the iTunes store, iPod users are clearly not locked into the iTunes store to acquire their music.

The second alternative is for Apple to license its FairPlay DRM technology to current and future competitors with the goal of achieving interoperability between different company's players and music stores. On the surface, this seems like a good idea since it might offer customers increased choice now and in the future. And Apple might benefit by charging a small licensing fee for its FairPlay DRM. However, when we look a bit deeper, problems begin to emerge. The most serious problem is that licensing a DRM involves disclosing some of its secrets to many people in many companies, and history tells us that inevitably these secrets will leak. The Internet has made such leaks far more damaging, since a single leak can be spread worldwide in less than a minute. Such leaks can rapidly result in software programs available as free downloads on the Internet which will disable the DRM protection so that formerly protected songs can be played on unauthorized players.

An equally serious problem is how to quickly repair the damage caused by such a leak. A successful repair will likely involve enhancing the music store software, the music jukebox software, and the software in the players with new secrets, then transferring this updated software into the tens (or hundreds) of millions of Macs, Windows PCs and players already in use. This must all be done quickly and in a very coordinated way. Such an undertaking is very difficult when just one company controls all of the pieces. It is near impossible if multiple companies control separate pieces of the puzzle, and all of them must quickly act in concert to repair the damage from a leak.

Apple has concluded that if it licenses FairPlay to others, it can no longer guarantee to protect the music it licenses from the big four music companies. Perhaps this same conclusion contributed to Microsoft's recent decision to switch their emphasis from an "open" model of licensing their DRM to others to a "closed" model of offering a proprietary music store, proprietary jukebox software and proprietary players.

The third alternative is to abolish DRMs entirely. Imagine a world where every online store sells DRM-free music encoded in open licensable formats. In such a world, any player can play music purchased from any store, and any store can sell music which is playable on all players. This is clearly the best alternative for consumers, and Apple would embrace it in a heartbeat. If the big four music companies would license Apple their music without the requirement that it be protected with a DRM, we would switch to selling only DRM-free music on our iTunes store. Every iPod ever made will play this DRM-free music.

Why would the big four music companies agree to let Apple and others distribute their music without using DRM systems to protect it? The simplest answer is because DRMs haven't worked, and may

never work, to halt music piracy. Though the big four music companies require that all their music sold online be protected with DRMs, these same music companies continue to sell billions of CDs a year which contain completely unprotected music. That's right! No DRM system was ever developed for the CD, so all the music distributed on CDs can be easily uploaded to the Internet, then (illegally) downloaded and played on any computer or player.

In 2006, under 2 billion DRM-protected songs were sold worldwide by online stores, while over 20 billion songs were sold completely DRM-free and unprotected on CDs by the music companies themselves. The music companies sell the vast majority of their music DRM-free, and show no signs of changing this behavior, since the overwhelming majority of their revenues depend on selling CDs which must play in CD players that support no DRM system.

So if the music companies are selling over 90 percent of their music DRM-free, what benefits do they get from selling the remaining small percentage of their music encumbered with a DRM system? There appear to be none. If anything, the technical expertise and overhead required to create, operate and update a DRM system has limited the number of participants selling DRM protected music. If such requirements were removed, the music industry might experience an influx of new companies willing to invest in innovative new stores and players. This can only be seen as a positive by the music companies.

Much of the concern over DRM systems has arisen in European countries. Perhaps those unhappy with the current situation should redirect their energies towards persuading the music companies to sell their music DRM-free. For Europeans, two and a half of the big four music companies are located right in their backyard. The largest, Universal, is 100% owned by Vivendi, a French company. EMI is a British company, and Sony BMG is 50% owned by Bertelsmann, a German company. Convincing them to license their music to Apple and others DRM-free will create a truly interoperable music marketplace. Apple will embrace this wholeheartedly.

## **PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Latham & Watkins LLP, 633 West Fifth Street, Suite 4000, Los Angeles, California 90071. On March 24, 2008, I caused the foregoing to be served:

**DECLARATION OF COLIN B. VANDELL IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

I caused the above document(s) to be deposited for facsimile transmission in accordance with the office practice of Latham & Watkins LLP for collecting and processing facsimiles. I am familiar with the office practice of Latham & Watkins LLP for collecting, processing, and transmitting facsimiles, which practice is that when a facsimile is deposited with the Latham & Watkins LLP personnel responsible for facsimiles, such facsimile is transmitted that same day in the ordinary course of business. The facsimile of the above document(s) was transmitted to the following parties: See the attached Facsimile List.

**X**    I caused a sealed envelope or package containing the document(s) to be placed in a post office, mailbox, sub-post office, substation, mail chute, or other like facility regularly maintained by the United States Postal Service for receipt of U.S. Mail, with U.S. Mail postage paid, addressed to all parties listed on the attached Service List.

I caused such envelope to be delivered by Federal Express or Hand Delivery to the offices of the addressee(s). See attached Service List.

I cause a pdf version of this document to be delivered via electronic mail to the attached Service List.

I declare under penalty of perjury that the above is true and correct. Executed on March 24, 2008 at Los Angeles, California.

Colleen M. Rico

**Service List**

Mark L Block
Christensen Glaser Fink Jacobs Weil & Shapiro
10250 Constellation Blvd, 19th Fl
Los Angeles, CA 90067

Paul H Duvall
King and Ballow
9404 Genesee Avenue, Suite 340
La Jolla, CA 92037-1355

Richard S Busch
King & Ballow
315 Union St, Ste 1100
Nashville, TN 37201

Glenn D Pomerantz
Munger Tolles & Olson
355 S Grand Ave, 35th Fl
Los Angeles, CA 90071-1560