1  Richard S. Busch (TN Bar No. 014594 (*pro hac vice*)
2  rbusch@kingballow.com
   KING & BALLOW
3  315 Union Street; Suite 1100
4  Nashville, TN  37201
   (615)259-3456 Facsimile: (615)726-5417
5
6  Paul H. Duvall (State Bar No.  73699)
   pduvall@kingballow.com
7  KING & BALLOW
8  9404 Genesee Avenue; Suite 340
   La Jolla, CA  92037
9  (858)597-6000 Facsimile:  (858)597-6008
10
   Mark L. Block (State Bar No. 115457)
11 mblock@chrisglase.com
12 CHRISTENSEN, GLASER, FINK JACOBS, WEIL & SHAPIRO, LLP
   10250 Constellation Blvd., 19th Floor
13 Los Angeles, CA 90067
14 (310) 553-3000   Facsimile: (310) 556-2920
15 Attorneys for Plaintiffs F.B.T. Productions, LLC and Em2M, LLC
16
                    UNITED STATES DISTRICT COURT
17              NORTHERN DISTRICT OF CALIFORNIA
18                       SAN JOSE DIVISION

| | |
|---|---|
| 19 **F.B.T. PRODUCTIONS, LLC, et al.,** ) | **Case: 5:08-mc-80040-RMW (PVT)** |
| 20 ) | **[Related to Case: CV 07-03314 PSG (MANx)]** |
| 21 **Plaintiffs,** ) | |
| 22 **v.** ) | **DECLARATION OF EUGENE R.** |
| 23 **AFTERMATH RECORDS doing** ) | **LONG, JR. IN SUPPORT OF PLAINTIFFS' OPPOSITION TO** |
| 24 **business as AFTERMATH ENTERTAINMENT, et al.,** ) | **MOTION FOR PROTECTIVE ORDER TO QUASH "APEX"** |
| 25 ) | **DEPOSITION SUBPOENA** |
| 26 **Defendants.** ) | |
| 27 ) | **[Opposition to Motion; Objections to evidence; and Exhibits filed** |
| 28 ) | **concurrently herewith]** |

| | | |
|---|---|---|
| 1 | ) | **DISCOVERY MATTER** |
| 2 | ) | |
| | ) | **JURY DEMAND** |
| 3 | ) | |
| 4 | ) | **Date: April 29, 2008** |
| | ) | **Time: 10:00 a.m.** |
| 5 | ) | **Courtroom: 5** |
| 6 | ) | **Hon. Patricia Trumbull** |

7  ///

8  ///

9  ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

# DECLARATION OF EUGENE R. LONG, JR.

I, Eugene R. Long, Jr., declare as follows:

1. I am an attorney at law duly licensed to practice before all of the courts in the State of California. I am an associate with the law firm of King & Ballow, counsel of record for Plaintiffs F.B.T. Productions, LLC ("F.B.T.") and Em2M, LLC ("Em2M") (collectively, "Plaintiffs") in this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2. A true correct and copy of the Plaintiffs' First Amended Complaint is attached to this declaration as **Exhibit A.**

3. A true and correct copy of the essay authored by Steve Jobs entitled "Thoughts on Music," which appeared online at www.apple.com/hotnews/ thoughtsonmusic, is attached to this declaration as **Exhibit B.**

4. A true and correct copy of the deposition subpoena that was served on Steve Jobs on March 3, 2008 is attached to this declaration as **Exhibit C.**

5. A true and correct copy of the meet and confer letter sent by counsel for Mr. Jobs on March 10, 2008 is attached to this declaration as **Exhibit D.**

6. A true and correct copy of the meet and confer letter that was sent by Plaintiffs to counsel for Mr. Jobs on March 13, 2008 is attached to this declaration as **Exhibit E.**

//

//

1    7. I declare under penalty of perjury under the laws of the State of California that

2    the foregoing is true and correct.

3

4    Executed on this 16th day of April, 2008, at La Jolla, California.

5

6    _____
     Eugene R. Long, Jr.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C 08-80040 RMW (PVT)
**[Related to Case No. CV 07-3314 PSG (MANx) (C.D.Cal.)]**

<u>**STATE OF CALIFORNIA, COUNTY OF SAN DIEGO**</u>

I, Sherie Johnson, declare:

I am a resident of the State of California and employed in the County of San Diego, State of California. I am over the age of eighteen years, and not a party to the within action. My business address is 9404 Genesee Avenue; Suite 340; La Jolla, CA 92037. On April 16, 2008 I served a true copy of the document entitled **Declaration of Eugene R. Long, Jr. in Support of Opposition to Motion for Protective Order to Quash "Apex" Deposition Subpoena** by placing it in an overnight delivery envelope or package provided by an overnight delivery carrier and addressed as below. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier on April 16, 2008.

| Glenn D. Pomerantz, Esq. Kelly M. Klaus, Esq. Kimberly D. Encinas, Esq. MUNGER, TOLLES & OLSON LLP 355 South Grand Avenue Thirty-Fifth Floor Los Angeles, CA 90071 Attorneys for Defendants | Daniel S. Schecter, Esq. Colin B. Vandell, Esq. LATHAM & WATKINS 633 West Fifth Street; Suite 4000 Los Angeles, CA 90071 Attorneys for Non-Party Deponent Steve Jobs | George A. Riley, Esq. O'MELVENY & MYERS LLP 275 Battery Street; Suite 2600 San Francisco, CA 94111 Attorneys for Non-Party Deponent Steve Jobs |
|---|---|---|

I declare under penalty of perjury that the above is true and correct.

Executed on April 16, 2008 at La Jolla, California.


/s/ Sherie Johnson
Sherie Johnson

# EXHIBIT

# A.

**Exhibit A-3**



Richard S. Busch (TN Bar No. 014594)
*Pro Hac Vice Pending*
KING & BALLOW
315 Union Street, Suite 1100
Nashville, TN 37201
(615) 259-3456   Facsimile: (615) 726-5417

Paul H. Duvall (State Bar No. 73699)
KING & BALLOW
9404 Genesee Avenue, Suite 340
La Jolla, CA 92037-1355
(858) 597-6000   Facsimile: (838) 597-6008

Mark L. Block (State Bar No. 115457)
Christensen, Glaser, Fink, Jacobs, Weil, & Shapiro, LLP
10250 Constellation Blvd., 19th Floor
Los Angeles, CA 90067
(310) 553-3000   Facsimile: (310) 556-2920

Attorneys for Plaintiffs F.B.T. Productions, LLC and Em2M, LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| F.B.T. PRODUCTIONS, LLC, and Em2M, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> AFTERMATH RECORDS doing business as AFTERMATH ENTERTAINMENT; INTERSCOPE RECORDS; UMG RECORDINGS, INC.; and ARY, INC., <br><br> Defendants. | Case No. CV 07-03314 PSG (MANx) <br><br> **FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT; DECLARATORY JUDGMENT** <br><br> **JURY DEMAND** |

**Exhibit A-4**

1

Plaintiffs F.B.T. Productions, LLC, and Em2M, LLC (collectively "Plaintiffs"), by and through their attorneys, for their Complaint against the Defendants named above allege as follows:

## I. NATURE OF THE ACTION

1.     This action for breach of contract and declaratory judgment against Defendants named herein arises from Defendants' failure to properly account to and pay Plaintiffs royalties with respect to master recordings of the musical performances by Marshall B. Mathers III professionally known as Eminem ("Eminem") licensed from Defendants by various "Music Download Providers" for reproduction and sale as more fully described hereinbelow (including but not limited to iTunes, Buy.com, Napster, among others) and by "Mastertone Providers" (including but not limited to Cingular Wireless, Sprint, T-Mobile, and certain affiliates of Defendants, among others).

2.     This action seeks remedies for Defendants' knowing violations of the terms of their agreements with Plaintiffs whereby Defendants have paid Plaintiffs significantly less royalties than are owed to Plaintiffs for the licensing of the master recordings to Music Download Providers and Mastertone Providers.

3.     Plaintiffs seek damages for breach of contract. Plaintiffs further seek a declaration, pursuant to 28 U.S.C. §2201, that Defendants are obligated to pay Plaintiffs an amount equal to fifty percent (50%) of Defendants' net receipts from

**Exhibit A-5**

2

the sale of records or other uses of the master sound recordings which are licensed by Defendants or Defendants' licensees to others for their manufacture and sale of records or for any other uses.

4.    Defendants' recording agreements with Plaintiffs require Defendants to pay Plaintiffs fifty percent (50%) of all net receipts received by Defendants on masters licensed by Defendants or Defendants' licensees to others for their manufacture and sale of records or for any other use.

5.    Rather than paying Plaintiffs fifty percent (50%) of the net receipts paid to Defendants for the licensed digital uses of master recordings featuring Eminem's performances, Defendants wrongfully (a) calculate royalties by applying an album royalty rate to an artificially imputed retail price of the download without a packaging or configuration deduction; (b) incorrectly compute domestic digital download sales using a fabricated retail price of 130% of wholesale price rather than the retail price actually charged to consumers by the licensees; and (c) apply territory reductions to so-called foreign digital download sales without an economic or contractual basis for such reductions.

6.    As a result of Defendants' intentional past and continuing contractual breaches, Plaintiffs have been damaged by the loss of royalty payments in excess of the jurisdictional limits of this Court which royalty payments Defendants have retained for their own benefit.

**Exhibit A-6**

7.    Plaintiffs seek compensatory damages, attorneys' fees and other costs, and a judgment declaring Plaintiffs' rights pursuant to the recording agreements with Defendants and the proper method of calculating royalty payments or crediting royalty accounts with respect to licensed digital uses of the applicable master recordings by third party Music Download Providers, Mastertone Providers and others, and requiring that Defendants adhere to the proper method of calculating such royalties in the future.

## PARTIES

8.    Plaintiff F.B.T. Productions LLC ("F.B.T.") is a Michigan limited liability company. The only members comprising F.B.T. are Mark Bass and Jeff Bass. Both members are natural persons and United States citizens. Both members are residents of Michigan and intend to reside in Michigan permanently, and therefore are domiciled in Michigan. F.B.T. is a citizen of Michigan.

9.    Plaintiff Em2M LLC ("Em2M") is a Michigan limited liability company. Joel Martin, a natural person, is the sole member of Em2M. Mr. Martin is a United States citizen and a resident of the State of Michigan. He intends to reside in Michigan permanently, and therefore is domiciled in Michigan. Em2M is a citizen of Michigan.

## Defendant Aftermath Records

10.    Defendant Aftermath Records and Aftermath Records doing business

**Exhibit A-7**

4

1  as Aftermath Entertainment ("Aftermath") is a joint venture between three entities:

2  (1) Interscope Records, a California general partnership (the "Interscope

3

4  Partnership"), (2) Interscope Records, an unincorporated division of UMG

5  Recordings, Inc., a Delaware corporation authorized to do business in the State of

6

7  California ("UMG"), and (3) ARY, Inc., a California corporation ("ARY"). The

8  Interscope Records, a Partnership, is a general partnership comprised of three

9

10  entities: (a) Interscope Records, an unincorporated division of UMG, (b) UMG,

11  and (c) PRI Productions, Inc., a Delaware Corporation. Based on the citizenship of

12  the entities of the joint venture, Aftermath Entertainment is a citizen of California

13

14  and Delaware.

15            a.      UMG is organized under the laws of the State of Delaware and

16

17  is a citizen of that state, as is its unincorporated division, Interscope Records.

18  UMG Recordings and its divisions also are citizens of the state that is UMG's

19  principal place of business, which is California.  According to its website,

20

21  "UMG's corporate headquarters are located at 2220 Colorado Avenue, Santa

22  Monica, CA 90404 and 1755 Broadway, New York, NY 10019." According to its

23

24  registration on file with the California Secretary of State, UMG is registered in the

25  State of Delaware and its offices are located at "10 Universal City Plaza, Universal

26  City, California, 91608." Lastly, UMG's critical copyright and licensing

27

28  department and its Film & TV Licensing departments are stationed in California as

**Exhibit A-8**

well. On information and belief, Plaintiffs allege that UMG employs a majority of its employees in California, and the majority of its executive and administrative functions are performed in California because (a) at least one of its two headquarters are located in California, (b) UMG's critical licensing and copyright divisions are located in California, and (c) a majority of its operations, both executive and administrative, take place in California.

b.    PRI Productions, Inc., (hereinafter, "PRI") is a Delaware Corporation registered to do business in California.    PRI's principal place of business is California.  It lists its address with the California Secretary of State as "10 Universal City Plaza, Universal City, CA, 91608."  This address is the exact same address as UMG registered with the California Secretary of State.   On information and belief, Plaintiffs allege that PRI is involved in the entertainment and music industries and performs the majority of its operations in California in concert with UMG.  Additionally, Plaintiffs allege on investigation and discovery that PRI has no executive and no administrative staff operating outside of California.  All of its operations therefore take place in California.  It is a citizen of California and Delaware.

11.    Interscope Records, a Partnership, is comprised of UMG and PRI, and is a citizen of Delaware and California because UMG and PRI are both citizens of Delaware and California.

**Exhibit A-9**

12.    Interscope Records, an unincorporated division of UMG, is legally indistinguishable from UMG, and its citizenship is the same as UMG. As explained above, UMG is a citizen of Delaware and California.

13.    ARY is a registered California Corporation. Plaintiffs allege on information and belief that ARY is owned and operated solely by Andre Rommel Young, Jr., professionally known as the hip-hop artist "Dr. Dre." The principal place of business of ARY is California. Its registered mailing address is 10100 Santa Monica Blvd., Suite 1300, Los Angeles, California 90067. ARY lists its agent for service of process as Howard King of the law firm King, Holmes, Paterno & Berliner, LLP, located at 1900 Avenue of the Stars, 25th Floor, Los Angeles, California 90067. On information and belief, Plaintiffs allege that Mr. Young lives in California and runs ARY exclusively from California. Also on information and belief, Plaintiffs allege that ARY has no employees other than Andre R. Young, Jr. and has no assets and no operations outside of California. ARY's principal place of business is California, and ARY is a citizen of California.

14.    Defendant Aftermath is a citizen of California and Delaware.

15.    For purposes of diversity jurisdiction, Defendants Aftermath, the Interscope Partnership and UMG are all citizens of Delaware and California. Defendant ARY, Inc., is a citizen of California. Plaintiffs, as citizens of Michigan, are diverse from Defendants' citizenship.

**Exhibit A-10**

## JURISDICTION AND VENUE

16.  The jurisdiction of this Court is based upon 28 U.S.C. §1332 as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.  This action for declaratory judgment is brought pursuant to 28 U.S.C. §2201 which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. §1331. Venue is proper in this District pursuant to 28 U.S.C. §§1391 and 1400(a).

17.  Personal jurisdiction over each of the Defendants is proper in this Court, among other reasons, on the grounds that (a) Defendants and/or Defendants' agents transact business in the State of California; (b) Defendants' wrongful conduct alleged herein occurred in the State of California and this District; and (c) the Agreements that are the subject of this action were entered into in this District.

18.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(c).

## GENERAL ALLEGATIONS

19.  On November 28, 1995, F.B.T. entered into an Exclusive Artist's Recording Agreement with Eminem ("1995 Agreement").  The 1995 Recording Agreement between F.B.T. and Eminem subsequently was amended on November 5, 1998, February 22, 1999 and November 28, 1999.

20.  On March 9, 1998 F.B.T. and Aftermath entered into a written

**Exhibit A-11**

8

agreement whereby F.B.T. agreed to furnish to Aftermath the exclusive recording services of "Eminem." ("March 9, 1998 Agreement") On March 9, 1998, Eminem also entered into a Letter of Inducement with Aftermath whereby Eminem acknowledged and approved of the agreement between F.B.T. and Aftermath for Eminem's exclusive recording services. ("Letter of Inducement")

21.     On September 27, 2000, F.B.T., Eminem and Aftermath entered into a novation of the March 9, 1998 Agreement between F.B.T. and Eminem whereby F.B.T. assigned all of its rights under the March 9, 1998 Agreement to Eminem, Eminem assumed all of F.B.T's rights and obligation to Aftermath, and Aftermath assumed F.B.T.'s obligations to Eminem so that Eminem would have a direct relationship with Aftermath effective September 27, 2000 ("Novation"). Pursuant to the Novation, F.B.T. irrevocably directed Aftermath to compute, account and pay directly to Joel Martin, twenty-five percent (25%) of the monies payable to F.B.T. under the Novation at the same times and on the same basis as Aftermath accounts to F.B.T. All parties expressly agreed Joel Martin is a third party beneficiary under the Novation.

22.     Pursuant to the terms of the Novation, among other things, F.B.T. remained an income participant with respect to all master recordings released by Aftermath under the Novation and to which F.B.T. would have had rights prior to the execution of the Novation (for purposes of this Complaint, the "Eminem

**Exhibit A-12**

Masters"). Further, pursuant to the terms of the Novation, the 1995 Recording Agreement with its three subsequent modifications as well as the March 9, 1998 Agreement and Letter of Inducement were affirmed by the parties. One of the terms of the Novation provided that the royalties owed by Aftermath pursuant thereto were to be divided between F.B.T. and Eminem.

23.     On or about August 22, 2003 and effective as of July 2, 2003, a new agreement was entered into between Aftermath and Eminem regarding, among other things, the Eminem Masters ("2003 Agreement"). Pursuant to the terms of the 2003 Agreement, all "Prior Agreements" are affirmed expressly including (a) the 1995 Recording Agreement and amendments thereto; (b) the March 9, 1998 Agreement and Letter of Inducement; and (c) the September 27, 2000 Novation.

24.     On September 20, 2004, Joel Martin assigned all of his interests in and to the 2000 Novation and under the 2003 Agreement to Em2M LLC, and all payments and accountings otherwise due to Joel Martin thereafter were due to be made by Defendants to Em2M LLC.

25.     On November 1, 2004, F.B.T. and Eminem, on the one hand, and Aftermath, on the other hand, entered into a written modification of the Novation ("2004 Amendment").

26.     Pursuant to the terms of the foregoing agreements referenced hereinabove, F.B.T. and Eminem caused certain recorded performances of Eminem

**Exhibit A-13**

to be delivered to Defendants, and Defendants agreed to manufacture, distribute, sell, and license for sale and distribution those master recordings in various configurations throughout the Universe.

27.    Plaintiffs have each performed their respective material obligations pursuant to the terms of each of the agreements referenced hereinabove.

28.    Pursuant to the terms of the March 9, 1998 Agreement and the 2003 Agreement, Defendants were to provide certain remuneration to Plaintiffs, including royalties, and to furnish Plaintiffs with semi-annual royalty accounting statements setting forth the computations of each Plaintiff's entitlement to royalties for the commercial exploitation of the Eminem Masters, which statements were to be accompanied by any royalty payments due.

29.    Pursuant to the terms of the March 9, 1998 Agreement and the 2003 Agreement, Defendants agreed to pay certain royalties as follows:   "On masters licensed by us or our Licensees to others for their manufacture and sale of records or for any other use, your royalty shall be an amount equal to fifty percent (50%) of our net receipts from the sale of those records or from those other uses of the masters."   The "other uses" of the Eminem Masters include, without limitation, Defendants, or Defendants' [L]icensees, licensing to various Music Download Providers and Mastertone Providers for digital uses, including digital downloads, digital streaming and mastertones.   The identities of each of the Music Download

**Exhibit A-14**

1  Providers and Mastertone Providers are known exclusively to Defendants.

2      30.    Under the agreements entered into between Plaintiffs and Defendants,

3

4  Defendants were obligated to act in good faith in their dealings with Plaintiffs and

5  to render accurate royalty accounting statements, and to properly credit and

6

7  account for the royalties generated by the commercial exploitation of the Eminem

8  Masters.

9      31.    During the period January 1, 2002 to present, Defendants or

10

11  Defendants' licensees have licensed the Eminem Masters to various Music

12  Download Providers including but not limited to iTunes, Buy.com, Napster, among

13

14  others, and Mastertone Providers (including but not limited to Cingular Wireless,

15  Sprint, T-Mobile, and certain affiliates of Defendants, among others).

16      32.    Upon information and belief, Defendants' agreements with the Music

17

18  Download Providers and Mastertone Providers involve the licensing of the

19  Eminem Masters to such Music Download Providers and Mastertone Providers for

20

21  sale in the form of digital music files which is encompassed in the definition of

22  "other uses of the masters" as set forth in the March 9, 1998 Agreement and the

23

24  2003 Novation.

25      33.    In 2005, F.B.T. and Eminem retained an accounting firm to review the

26

27  accounting records of Defendants and to perform a royalty audit on behalf of

28  Plaintiffs for the periods January 1, 2002 through and including June 30, 2005. On

**Exhibit A-15**

February 10, 2006, the accounting firm submitted its audit report to Defendants. As a result, the February 10, 2006 audit showed, among other things, that Plaintiffs, collectively, have been underpaid by Defendants for the digital uses in an amount in excess of $650,000.

## FIRST CAUSE OF ACTION
### (BREACH OF CONTRACT)

34.    Plaintiffs reallege each and every allegation in Paragraphs 1 through 33 hereof as if fully set forth herein.

35.    Defendants have failed to comply with the terms of the March 9, 1998 Agreement and the 2003 Agreement by failing to account and pay Plaintiffs fifty percent (50%) of Defendants' net receipts from the digital uses of the Eminem Masters by the Music Download Providers and Mastertone Providers. Defendants apply an incorrect formula for calculating royalties with respect to those royalties to be paid to Plaintiffs which results in Plaintiffs collectively receiving an average royalty of approximately twelve percent (12%) instead of the fifty percent (50%) required by the terms of the agreements.

36.    On February 21, 2007, and pursuant to paragraph 15(b) of the March 9, 1998 Agreement and the 2003 Agreement, Plaintiffs sent written notice to Defendants by certified mail, return receipt requested, advising Defendants of their breach of said agreements and requesting that Defendants cure the breach within thirty (30) days after the date of the notice.

**Exhibit A-16**

37.   Despite said notice, Defendants have failed and refused to cure the breach and continue to incorrectly calculate royalties in violation of the March 9, 1998 Agreement and 2003 Agreement.  As a result of Defendants' improper calculation of royalties, Defendants have further breached said agreements by their failure (a) to account properly, (b) to credit and pay the correct amount of royalties due to Plaintiffs; and (c) to render royalty statements reflecting the correct amount of royalties due to Plaintiffs.

38.   By reason of the foregoing and other acts not presently known by Plaintiffs, Defendants have knowingly and materially breached its contractual obligations to Plaintiffs under the March 9, 1998 Agreement and the 2003 Agreement, and wantonly have disregarded the rights of Plaintiffs.

39.   Pursuant to the terms of the 2003 Agreement, should any party institute any action or proceeding at law or in equity to enforce any provision of the 2003 Agreement, including an action for declaratory relief, or for damages by reason of an alleged breach of any provision of the 2003 Agreement, or otherwise in connection with the 2003 Agreement or any of its provisions, the prevailing party is entitled to recover from the non-prevailing party reasonable and actual attorneys' fees and costs for services rendered to the prevailing party in such action or proceeding.

40.   As a result of the wrongful conduct of Defendants alleged

**Exhibit A-17**

14

hereinabove, Plaintiffs have been damaged in an amount to be determined at the time of trial, which upon information and belief is well in excess of one million dollars ($1,000,000) for the digital uses.

## SECOND CAUSE OF ACTION
## (DECLARATORY JUDGMENT)

41.    Plaintiffs reallege each and every allegation in Paragraphs 1 through 40 hereof as if fully set forth herein.

42.    Pursuant to 28 U.S.C. §2201, this Court may declare the rights and other legal relations of any interested party seeking such declaration whether or not further relief is, or could be, sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

43.    Plaintiffs contend, and seek a declaration, that, pursuant to the March 9, 1998 Agreement and the 2003 Agreement, Defendants are obligated to pay Plaintiffs, collectively, fifty percent (50%) of Defendants' net receipts derived from the licensing by Defendants or Defendants' Licensees to others "for their manufacture and sale of records or for any other uses" of the Eminem Masters, including, without limitation, Music Download Providers and Mastertone Providers, the identities of which are known exclusively by Defendants. Defendants deny they have such an obligation under said agreements.

44.    Plaintiffs have no adequate remedy at law.

45.    By reason of the foregoing, there is a present controversy between

**Exhibit A-18**

Plaintiffs and Defendants for which a declaratory judgment should be entered determining that the March 9, 1998 Agreement and the 2003 Agreement obligates Defendants to pay Plaintiffs, collectively, fifty percent (50%) of Defendants' net receipts from the licensing by Defendants or Defendants' Licensees of the Eminem Masters to Music Download Providers and Mastertone Providers for sale.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a jury trial against Defendants on those matters to be determined by a jury and further pray for judgment against Defendants, and each of them, as follows:

1.    On the First Cause of Action, judgment awarding Plaintiffs compensatory damages, the exact amount is to be determined at the time of trial;

2.    On the Second Cause of Action, an order and judgment declaring that the March 9, 1998 Agreement and the 2003 Agreement obligates Defendants to pay Plaintiffs, collectively, fifty percent (50%) of Defendants' net receipts from the licensing by Defendants or Defendants' Licensees to Music Download Providers, Mastertone Providers, and others for digital and other licensed uses of the Eminem Masters, including, without limitation, digital downloads, digital streaming and digital mastertones;

3.    An award of reasonable and actual attorneys' fees and costs for services rendered to Plaintiffs in this action;

**Exhibit A-19**

16

4. An award of pre- and post-judgment interest;

5. Such other and further relief as the Court deems just and proper.

DATED: June 12, 2007                    Respectfully submitted,

                                        KING & BALLOW


                                        Richard S. Busch (TN Bar No. 014594)
                                        *Pro hac vice pending*
                                        Paul H. Duvall (State Bar No. 73699)
                                        9404 Genesee Avenue, Suite 340
                                        La Jolla, CA 92037-1355
                                        Telephone: (858) 597-6000
                                        Facsimile:  (838) 597-6008
                                        pduvall@kingballow.com
                                        rbusch@kingballow.com

                                        Mark Block (State Bar No. 115457)
                                        Christensen, Glaser, Fink, Jacobs, Weil, &
                                        Shapiro, LLP
                                        10250 Constellation Blvd. 19th Floor
                                        Los Angeles, CA 90067
                                        Telephone:  (310) 282-6240
                                        Facsimile:  (310) 556-2920
                                        mblock@chrisglase.com

                                        Attorneys for Plaintiffs

**Exhibit A-20**

# EXHIBIT

# B.

# Thoughts on Music

Steve Jobs
February 6, 2007

With the stunning global success of Apple's iPod music player and iTunes online music store, some have called for Apple to "open" the digital rights management (DRM) system that Apple uses to protect its music against theft, so that music purchased from iTunes can be played on digital devices purchased from other companies, and protected music purchased from other online music stores can play on iPods. Let's examine the current situation and how we got here, then look at three possible alternatives for the future.

To begin, it is useful to remember that all iPods play music that is free of any DRM and encoded in "open" licensable formats such as MP3 and AAC. IPod users can and do acquire their music from many sources, including CDs they own. Music on CDs can be easily imported into the freely-downloadable iTunes jukebox software which runs on both Macs and Windows PCs, and is automatically encoded into the open AAC or MP3 formats without any DRM. This music can be played on iPods or any other music players that play these open formats.

The rub comes from the music Apple sells on its online iTunes Store. Since Apple does not own or control any music itself, it must license the rights to distribute music from others, primarily the "big four" music companies: Universal, Sony BMG, Warner and EMI. These four companies control the distribution of over 70% of the world's music. When Apple approached these companies to license their music to distribute legally over the Internet, they were extremely cautious and required Apple to protect their music from being illegally copied. The solution was to create a DRM system, which envelopes each song purchased from the iTunes store in special and secret software so that it cannot be played on unauthorized devices.

Apple was able to negotiate landmark usage rights at the time, which include allowing users to play their DRM protected music on up to 5 computers and on an unlimited number of iPods. Obtaining such rights from the music companies was unprecedented at the time, and even today is unmatched by most other digital music services. However, a key provision of our agreements with the music companies is that if our DRM system is compromised and their music becomes playable on unauthorized devices, we have only a small number of weeks to fix the problem or they can withdraw their entire music catalog from our iTunes store.

To prevent illegal copies, DRM systems must allow only authorized devices to play the protected music. If a copy of a DRM protected song is posted on the Internet, it should not be able to play on a downloader's computer or portable music device. To achieve this, a DRM system employs secrets. There is no theory of protecting content other than keeping secrets. In other words, even if one uses the most sophisticated cryptographic locks to protect the actual music, one must still "hide" the keys which unlock the music on the user's computer or portable music player. No one has ever implemented a DRM system that does not depend on such secrets for its operation.

The problem, of course, is that there are many smart people in the world, some with a lot of time on their hands, who love to discover such secrets and publish a way for everyone to get free (and stolen) music. They are often successful in doing just that, so any company trying to protect content using a DRM must frequently update it with new and harder to discover secrets. It is a cat-and-mouse game. Apple's DRM system is called FairPlay. While we have had a few breaches in FairPlay, we have been able to successfully repair them through updating the iTunes store software, the iTunes jukebox software and software in the iPods themselves. So far we have met our commitments to the music companies to protect their music, and we have given users the most liberal usage rights available in the industry for legally downloaded music.

With this background, let's now explore three different alternatives for the future.

The first alternative is to continue on the current course, with each manufacturer competing freely with their own "top to bottom" proprietary systems for selling, playing and protecting music. It is a

**Exhibit B-22**

very competitive market, with major global companies making large investments to develop new music players and online music stores. Apple, Microsoft and Sony all compete with proprietary systems. Music purchased from Microsoft's Zune store will only play on Zune players; music purchased from Sony's Connect store will only play on Sony's players; and music purchased from Apple's iTunes store will only play on iPods. This is the current state of affairs in the industry, and customers are being well served with a continuing stream of innovative products and a wide variety of choices.

Some have argued that once a consumer purchases a body of music from one of the proprietary music stores, they are forever locked into only using music players from that one company. Or, if they buy a specific player, they are locked into buying music only from that company's music store. Is this true? Let's look at the data for iPods and the iTunes store – they are the industry's most popular products and we have accurate data for them. Through the end of 2006, customers purchased a total of 90 million iPods and 2 billion songs from the iTunes store. On average, that's 22 songs purchased from the iTunes store for each iPod ever sold.

Today's most popular iPod holds 1000 songs, and research tells us that the average iPod is nearly full. This means that only 22 out of 1000 songs, or under 3% of the music on the average iPod, is purchased from the iTunes store and protected with a DRM. The remaining 97% of the music is unprotected and playable on any player that can play the open formats. It's hard to believe that just 3% of the music on the average iPod is enough to lock users into buying only iPods in the future. And since 97% of the music on the average iPod was not purchased from the iTunes store, iPod users are clearly not locked into the iTunes store to acquire their music.

The second alternative is for Apple to license its FairPlay DRM technology to current and future competitors with the goal of achieving interoperability between different company's players and music stores. On the surface, this seems like a good idea since it might offer customers increased choice now and in the future. And Apple might benefit by charging a small licensing fee for its FairPlay DRM. However, when we look a bit deeper, problems begin to emerge. The most serious problem is that licensing a DRM involves disclosing some of its secrets to many people in many companies, and history tells us that inevitably these secrets will leak. The Internet has made such leaks far more damaging, since a single leak can be spread worldwide in less than a minute. Such leaks can rapidly result in software programs available as free downloads on the Internet which will disable the DRM protection so that formerly protected songs can be played on unauthorized players.

An equally serious problem is how to quickly repair the damage caused by such a leak. A successful repair will likely involve enhancing the music store software, the music jukebox software, and the software in the players with new secrets, then transferring this updated software into the tens (or hundreds) of millions of Macs, Windows PCs and players already in use. This must all be done quickly and in a very coordinated way. Such an undertaking is very difficult when just one company controls all of the pieces. It is near impossible if multiple companies control separate pieces of the puzzle, and all of them must quickly act in concert to repair the damage from a leak.

Apple has concluded that if it licenses FairPlay to others, it can no longer guarantee to protect the music it licenses from the big four music companies. Perhaps this same conclusion contributed to Microsoft's recent decision to switch their emphasis from an "open" model of licensing their DRM to others to a "closed" model of offering a proprietary music store, proprietary jukebox software and proprietary players.

The third alternative is to abolish DRMs entirely. Imagine a world where every online store sells DRM-free music encoded in open licensable formats. In such a world, any player can play music purchased from any store, and any store can sell music which is playable on all players. This is clearly the best alternative for consumers, and Apple would embrace it in a heartbeat. If the big four music companies would license Apple their music without the requirement that it be protected with a DRM, we would switch to selling only DRM-free music on our iTunes store. Every iPod ever made will play this DRM-free music.

Why would the big four music companies agree to let Apple and others distribute their music without using DRM systems to protect it? The simplest answer is because DRMs haven't worked, and may

never work, to halt music piracy. Though the big four music companies require that all their music sold online be protected with DRMs, these same music companies continue to sell billions of CDs a year which contain completely unprotected music. That's right! No DRM system was ever developed for the CD, so all the music distributed on CDs can be easily uploaded to the Internet, then (illegally) downloaded and played on any computer or player.

In 2006, under 2 billion DRM-protected songs were sold worldwide by online stores, while over 20 billion songs were sold completely DRM-free and unprotected on CDs by the music companies themselves. The music companies sell the vast majority of their music DRM-free, and show no signs of changing this behavior, since the overwhelming majority of their revenues depend on selling CDs which must play in CD players that support no DRM system.

So if the music companies are selling over 90 percent of their music DRM-free, what benefits do they get from selling the remaining small percentage of their music encumbered with a DRM system? There appear to be none. If anything, the technical expertise and overhead required to create, operate and update a DRM system has limited the number of participants selling DRM protected music. If such requirements were removed, the music industry might experience an influx of new companies willing to invest in innovative new stores and players. This can only be seen as a positive by the music companies.

Much of the concern over DRM systems has arisen in European countries. Perhaps those unhappy with the current situation should redirect their energies towards persuading the music companies to sell their music DRM-free. For Europeans, two and a half of the big four music companies are located right in their backyard. The largest, Universal, is 100% owned by Vivendi, a French company. EMI is a British company, and Sony BMG is 50% owned by Bertelsmann, a German company. Convincing them to license their music to Apple and others DRM-free will create a truly interoperable music marketplace. Apple will embrace this wholeheartedly.

**Exhibit B-24**

# EXHIBIT

# C.

Exhibit C-25

AO 88 (Rev. 1/94) Subpoena in a Civil Case

Issued by the
# United States District Court
### Northern District of California

.  F.B.T. Productions, LLC, et al.

**v.**

**Aftermath Records, et al.**

**SUBPOENA IN A CIVIL CASE**
Case No. CV 07-3314 PSG (MANx)
**Central District of California**

**TO:**    Steve Jobs, CEO Apple, Inc.
c/o Daniel S. Schecter, Esq.
Colin B. Vandell, Esq.
Latham & Watkins, LLP
644 West Fifth Street
Suite 4000
Los Angeles, CA 90071-2007

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

Latham & Watkins, LLP
140 Scott Drive
Menlo Park CA 94025

March 27, 2008
9:00 AM P.S.T.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☐ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

| PLACE | DATE AND TIME |
|---|---|

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Richard S Busch  by MRG*      Plaintiff | 3/3/08 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Richard S. Busch, Esq.
King & Ballow
315 Union Street
1100 Union Street Plaza
Nashville, TN 37201
(615) 259-3456

**Exhibit C-26**

| Attorney or Party without Attorney: | | | | For Court Use Only |
|---|---|---|---|---|
| RICHARD S. BUSCH, ESQ.<br>KING & BALLOW<br>9404 GENESEE AVE<br>SUITE 340<br>LA JOLLA, CA 92037<br>Telephone No: 858-597-6000 | | | | |
| Attorney for: Plaintiff | | Ref. No. or File No.: | | |
| Insert name of Court, and Judicial District and Branch Court: | | | | |
| United States District Court Northern District Of California | | | | |
| Plaintiff: F.B.T. PRODUCTIONS, LLC | | | | |
| Defendant: AFTERMATH RECORDS | | | | |

| PROOF OF SERVICE<br>SUBPOENA IN A CIVIL | Hearing Date:<br>Thu, Mar. 27, 2008 | Time:<br>9:00AM | Dept/Div: | Case Number:<br>CV07-3314 PSG (MANx) |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUBPOENA IN A CIVIL CASE; NOTICE OF DEPOSITION OF STEVE JOBS.

3. a. *Party served:*        DANIEL S. SCHECTER, ESQ., COLIN B. VANDELL, ESQ.
    b. *Person served:*      LUZ OSIRO, AUTHORIZED TO ACCEPT SERVICE.

4. *Address where the party was served:*      LATHAM & WATKINS, LLP
                                    644 WEST FIFTH STREET
                                      SUITE 4000
                                      LOS ANGELES, CA 90071

5. *I served the party:*
    a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of
       process for the party (1) on: Mon., Mar. 03, 2008 (2) at: 4:40PM
    b. *I received this subpena for service on:*      Monday, March 03, 2008

6. *Witness fees were not demanded or paid.*

7. **Person Who Served Papers:**                                      Recoverable Cost Per CCP 1033.5(a)(4)(B)
    a. MANUEL ROMERO                   d. *The Fee for Service was:*

                                       e. I am: (3) registered California process server
    **First Legal Support Services** ℠            *(i)*   Employee
         ATTORNEY SERVICES              *(ii)*   *Registration No.:*
        1511 BEVERLY BOULEVARD        
        Los Angeles, CA 90026              *(iii)*   *County:*          Los Angeles
        (213) 250-1111, FAX (213) 250-1197

8. *I declare under penalty of perjury under the laws of the State of California and under the laws of the United States Of
America that the foregoing is true and correct.*

Date: Tue, Mar. 11, 2008

Rule 982.9.(a)&(b) Rev January 1, 2007             PROOF OF SERVICE                            (MANUEL ROMERO)
    Judicial Council Form           SUBPOENA IN A CIVIL                                911364.richus.118871

**Exhibit C-27**

# CERTIFICATE OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF SAN DIEGO

1

2    I, Sherie Johnson, declare:

3    I am employed in the County of San Diego, State of California. I am over the

4    age of eighteen years, and not a party to the within action. My business address is

9404 Genesee Avenue; Suite 340; La Jolla, CA 92037. On March 3, 2008, I

5    instructed First Legal Support Services to personally serve a true copy of the

6    attached documents entitled **NOTICE OF DEPOSITION OF STEVE JOBS** and

**SUBPOENA IN A CIVIL CASE TO STEVE JOBS** upon:

| | |
|---|---|
| 7    Glenn D. Pomerantz, Esq. | Daniel S. Schecter, Esq. |
| Kelly M. Klaus, Esq. | Colin B. Vandell, Esq. |
| 8    Kimberly D. Encinas, Esq. | LATHAM & WATKINS |
| 9    MUNGER, TOLLES & OLSON LLP | 633 West Fifth Street, Suite 4000 |
| 355 South Grand Avenue, 35ᵗʰ Floor | Los Angeles, CA 90071-2007 |
| 10    Los Angeles, CA 90071-1560 | On behalf of Steve Jobs |
| 11    Attorneys for Defendants | |

12    I also instructed First Legal Support Services to prepare a Proof of Personal Service.

13

14    I also served a true copy of the attached documents entitled **NOTICE OF**
**DEPOSITION OF STEVE JOBS** and **SUBPOENA IN A CIVIL CASE TO**

15    **STEVE JOBS** by placing same in an addressed sealed envelope clearly labeled to

16    identify the persons being served at the address shown below and placed said

envelope for collection with the United States Postal Service located at 9404

17    Genesee Avenue; La Jolla, California 92037, on March 3, 2008, following ordinary

18    business practices:

| | |
|---|---|
| 19    Glenn D. Pomerantz, Esq. | Daniel S. Schecter, Esq. |
| Kelly M. Klaus, Esq. | Colin B. Vandell, Esq. |
| 20    Kimberly D. Encinas, Esq. | LATHAM & WATKINS |
| MUNGER, TOLLES & OLSON LLP | 633 West Fifth Street, Suite 4000 |
| 21    355 South Grand Avenue | Los Angeles, CA 90071-2007 |
| 22    Thirty-Fifth Floor | On behalf of Steve Jobs |
| Los Angeles, CA 90071-1560 | |
| 23    Attorneys for Defendants | |

24    I declare that I am employed in the office of a member of the bar of this Court

25    at whose direction the service was made. Executed on March 3, 2008, at La Jolla,

26    California.

27                                        _Sherie Johnson_
                                        Sherie Johnson

28

Kng &
Ballow

**Exhibit C-28**

# EXHIBIT

# D.

Daniel Scott Schecter
Direct Dial: (213) 891-8679
daniel.schecter@lw.com

633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007
Tel: +213.485.1234 Fax: +213.891.8763
www.lw.com

# LATHAM&WATKINS LLP

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

March 10, 2008

## VIA EMAIL AND FEDERAL EXPRESS

Richard S. Busch, Esq.
King & Ballow
315 Union Street, Suite 1100
Nashville, Tennessee 37201

Paul H. Duvall, Esq.
King & Ballow
9404 Genesee Avenue, Suite 340
La Jolla, California 92037

Mark L. Block, Esq.
Christensen, Glaser, Fink, Jacobs, Weil & Shapiro LLP
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067

Re: *F.B.T. Prods. LLC v. Aftermath Records* - Case No. CV07-3314 PSG (MANx)

Dear Counsel:

We write pursuant to Northern District of California Local Rule 37-1 to request a conference of counsel in advance of the filing of a motion for protective order with respect to Plaintiffs' deposition subpoena directed to Steve Jobs.

Plaintiffs' attempt to take the deposition of Mr. Jobs is absolutely precluded as a matter of law. The proposed deposition is a classic example of an "apex" deposition and is particularly inappropriate given that Apple Inc. is not a party to this action. Courts consistently have barred efforts to depose high-ranking corporate officials. *See, e.g., Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 483 (10th Cir. 1995). This authority is particularly compelling given that in each of these cases the court barred an apex deposition of a high-ranking executive **of one of the parties** or a party subsidiary.

During the meet and confer process for Plaintiffs' subpoena for documents to Apple, Plaintiffs conveyed that their purported justification for seeking Mr. Jobs' deposition is his essay "Thoughts On Music." Plaintiffs' apparent obsession with Mr. Jobs' comments simply cannot justify the apex deposition of a non-party witness, and smacks of harassment.

**Exhibit D-30**

LATHAM&WATKINSLLP

        Please confirm a time for a conference call so that we can discuss this matter promptly.  I can be reached at (213) 891-8679.

                Very truly yours,

                Daniel Scott Schecter
                of LATHAM & WATKINS LLP

**Exhibit D-31**

# EXHIBIT

# E.

KING & BALLOW

LAW OFFICES

LA JOLLA EASTGATE

9404 GENESEE AVENUE, SUITE 340

LA JOLLA, CALIFORNIA 92037-1355

TELEPHONE: 858/597-6000

FACSIMILE: 858/597-6008

www.kingballow.com

March 13, 2008

**VIA EMAIL AND FIRST CLASS MAIL**
**daniel.schecter@lw.com**

Daniel Scott Schecter, Esq.
Latham & Watkins
633 West Fifth Street, Suite 4000
Los Angeles, CA 90071-2007

Re: *F.B.T. Prods. LLC v. Aftermath Records* - Case No. CV07-3314 PSG(MANx)

Dear Mr. Schecter:

I write to you in response to your letter of March 10, 2008 pursuant to Northern District of California Local Rule 37-1 regarding our request to depose Steve Jobs, of Apple, Inc. On March 3, 2008, we served a notice of deposition for Mr. Jobs on your law firm. Mr. Jobs' deposition is currently scheduled for March 27, 2008.

Your letter opposes the taking of Mr. Jobs' deposition and states that the deposition is "absolutely precluded as a matter of law." Your letter cites to the case of Thomas v. Int'l Bus. Machs., a Tenth Circuit case dealing with the "apex" deposition. Thomas v. IBM is distinguishable from this matter for several reasons: 1) the Plaintiff in Thomas violated local rules concerning time requirements for noticing a deposition, 2) Akers, the Chairman of IBM's Board of Directors, provided a declaration stating that he did not have any personal knowledge regarding the matters at issue in the case, and 3) the Plaintiff had not made attempts to gather the information using less intrusive means. Thomas is also distinguishable because it refers to the deposition of an officer of a party defendant. In this case, Apple is a third party. Moreover, as you implicitly recognize, there is no Ninth Circuit case law on this issue.

Recent district court cases within the Ninth Circuit have discussed the "apex" deposition rule. In Webside Story v. NetRatings,Inc., the Southern District of California stated that there were two prongs to the "apex" rule: 1) Whether or not the high-level deponent has unique, first hand, non-repetitive knowledge of the facts at issue, and 2) whether the party seeking the deposition has exhausted other less intrusive discovery methods. Webside Story v. NetRatings, Inc., 2007 U.S. Dist. Lexis 20481, (S.D.Cal. 2007).

**Exhibit E-33**

NASHVILLE OFFICE:

1100 UNION STREET PLAZA · 315 UNION STREET · NASHVILLE, TENNESSEE 37201 · TELEPHONE: 615/259-3456 · FACSIMILE: 615/254-7907

Daniel Scott Schecter, Esq.
March 13, 2008
Page 2

In Celerity, Inc. v. Ultra Clean Holding, Inc., the Northern District of California discussed the "apex" rule in the context of a deposition of a notice of deposition to CEO of Celerity. Celerity, Inc. v. Ultra Clean Holding, Inc., 2007 U.S. Dist. Lexis 8295 (N.D. Cal. 2007). In that case, the court noted that the "apex" rule was not an absolute bar to the deposition of the CEO and stated that Ultra Clean could renew its notice of deposition after less intrusive methods failed to provide the discovery being sought.

Our request to depose Mr. Jobs is distinguishable from the cases discussed above. In this case, we have given proper notice in compliance with the local rules. Less intrusive methods are not available as Rule 33, Federal Rules of Civil Procedure limits interrogatories to being served only on parties to the litigation. In this matter, Apple is a non-party. Furthermore, we have attempted to use subpoenas *duces tecum* to obtain related documents. As you know from previous meet and confer sessions, you have adamantly refused to either locate and/or produce such documents.

Depositions of lower level Apple employees would not be sufficient. The discovery that we are seeking is based on an essay authored by Mr. Jobs himself in which he discussed his thoughts on the current state of the industry with regards to Digital Rights Management. As a result, Mr. Jobs' knowledge is uniquely personal and not available by deposing a lower-level employee.

You stated in your letter that our deposition notice to Mr. Jobs "smacks of harassment." This is not the case. Typically, the "apex" rule is invoked in cases where one party seeks to depose a high ranking official of the other party who has limited knowledge of the relevant facts, where there is at least an implied improper strategic purpose. Apple is not a party to this litigation. As a result, the deposition subpoena served on Mr. Jobs serves no improper (or even any) strategic purpose. We simply need Mr. Jobs to testify concerning the essay that he personally authored and his statements which are directly relevant and essential to this case.

In an effort to come to a reasonable accord, we would agree to reasonable limitations concerning the length and the location of the depositions. If Mr. Jobs does not appear at his noticed deposition, we will move to compel and seek sanctions. Please contact me to confer regarding this dispute in accordance with the requirements of Local Rule 37-1. I can be reached at (858) 597-6000.

Very truly yours,

Paul H. Duvall

PHD:sj

**Exhibit E-34**